## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| PEDRO JAMES WHITE, <br><br> Plaintiff, <br><br> v. <br><br> JOSIE GASTELO et al., <br><br> Defendants. | No. CV 21-02351-GW (DFM) <br><br> Report and Recommendation of United States Magistrate Judge |

This Report and Recommendation is submitted to the Honorable George H. Wu, United States District Judge, under 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for the Central District of California.

## I.    INTRODUCTION

Plaintiff Pedro James White, Sr. ("Plaintiff"), a state prisoner currently incarcerated at the California Health Care Facility ("CHCF") in Stockton, California, filed a pro se civil rights action under 42 U.S.C. § 1983. See Dkt. 1. After the initial and amended complaints were dismissed with leave to amend, Plaintiff filed the operative Third Amended Complaint, alleging First Amendment retaliation and Eighth Amendment excessive force claims against Defendant Reyes-Cortez, a Correctional Officer at Plaintiff's former facility,

California Men's Colony ("CMC") in San Luis Obispo, California. See Dkt. 43 ("TAC") at 1-2.[1]

Defendant now moves for summary judgment. See Dkt. 61 ("MSJ"). In support, Defendant submitted: (1) a Statement of Uncontroverted Facts and Conclusions of Law ("Def.'s UF"); (2) the Declaration of Carolyn G. Widman, with portions of Plaintiff's disciplinary records and deposition transcript attached thereto; (3) the Declaration of J. Stout, with Plaintiff's grievance records attached thereto; (4) the Declaration of M. Reyes-Cortez; (5) the Declaration of A. Adams, M.D., with portions of Plaintiff's health record attached thereto; and (6) the Declaration of Howard E. Moseley, with Plaintiff's grievance appeal records attached thereto. See id.

Plaintiff filed an opposition. See Dkt. 70 ("Opp'n").[2] In support, Plaintiff submitted: (1) a Statement of Genuine Issues of Material Fact ("Pl.'s UF"); (2) the Declaration of Plaintiff, with portions of Plaintiff's deposition transcript attached thereto; and (3) the Declaration of Plaintiff's son, Pedro White Jr., with several articles from medical journals discussing injuries from tight handcuffing attached thereto. See Dkt. 71.

Defendant filed a Reply. See Dkt. 74 ("Reply").

For the reasons set forth below, the Court recommends that Defendant's Motion for Summary Judgment be DENIED.

## II.    FACTUAL BACKGROUND

At all times relevant to the TAC, Plaintiff was in the custody of the California Department of Corrections and Rehabilitation ("CDCR") at CMC. See Def.'s UF ¶ 1. On December 24, 2019, Defendant was on duty at CMC as

---

[1] Citations to page numbers refer to the CM/ECF pagination.

[2] The table of contents to Plaintiff's opposition is filed separately at Dkt. 69.

the Facility C, Building 6 Fourth Officer. See id. ¶ 16. At or around 10:30 a.m., the First Floor Officer requested support while he conducted a search of Plaintiff's cell. See id. While Defendant characterizes this cell search as "routine," Dkt. 61-5 ("Reyes-Cortez Decl.") ¶ 4, Plaintiff states that it was a "targeted cell search, based on retaliation," TAC at 1.[3] During the search, the First Floor Officer discovered a contraband cell phone charger. See Def.'s UF ¶ 17.[4] The First Floor Officer confiscated the charger and continued to search Plaintiff's cell. See id.

At some point, Defendant saw Plaintiff approach the First Floor Officer conducting the cell search. See Def.'s UF ¶ 19. What happened next is disputed. According to Defendant, Plaintiff appeared "agitated" and "loudly demanded to be present during the search." Reyes-Cortez Decl. ¶ 5. Plaintiff, in contrast, maintains he was "calm, respectful, and compliant." Pl.'s UF ¶ 19. The parties agree that it is standard practice at CMC to handcuff and remove an inmate who behaves in a disruptive manner during a cell search. See id. ¶ 21. However, the parties dispute Plaintiff's conduct leading up to his handcuffing. In Defendant's version of events, she determined that, due to Plaintiff's disruptive behavior and the discovery of the contraband charger, it was unsafe for him to be present during the cell search; accordingly, Defendant

---

[3] Because Plaintiff attested under penalty of perjury that the contents of the TAC are true and correct, the Court considers his complaint as an opposing affidavit to the extent his contentions are based on personal knowledge and set forth facts admissible in evidence. See Jones v. Blanas, 393 F.3d 918, 922-23 (9th Cir. 2004).

[4] Plaintiff later received a rules violation report ("RVR") for possession of a cell phone component. See Def.'s UF ¶ 18. Plaintiff disputes that the charger was for a cell phone and states it was "actually a vape pen charger" that "could not possibly have been used to charge any phone ever made." Dkt. 71 at 17-19 ("Pl.'s Decl.") ¶ 12.

ordered Plaintiff to turn around to be handcuffed. See Def.'s UF ¶ 22. Plaintiff maintains the First Floor Officer ordered Defendant to handcuff him because, even though Plaintiff was not disruptive during the cell search, the Officer believed Plaintiff had a "propensity to become agitated." Pl.'s UF ¶ 22. In any event, Plaintiff complied with the order, and Defendant handcuffed him. See id.

Defendant states that she did not place the handcuffs on Plaintiff in an unusually tight manner, did not handcuff him with the intention to cause pain, and did not observe anything in Plaintiff's conduct or demeanor that suggested the handcuffs were too tight. See Reyes-Cortez Decl. ¶ 8. Consistent with Defendant's training, she "always" confirms that her index finger fits between an inmate's wrists and the handcuffs to ensure "the handcuffs will not cut off circulation but are snug enough to prevent the possibility of escape." Id. ¶ 9. In Defendant's experience, after an inmate is placed in handcuffs, a housing unit officer escorts the inmate to the entrance of the housing unit, where a yard officer takes over the escort to the program office. See Def.'s UF ¶ 24. Based on this general practice, Defendant believes she escorted Plaintiff from the first-floor cell area to the entrance of Building 6, where a Facility C yard officer took custody of Plaintiff and escorted him to the program office for placement in a temporary holding cell. See id. Defendant does not recall having further involvement with Plaintiff on December 24, 2019. See id. ¶ 25.

In contrast, Plaintiff states that after Defendant handcuffed him, she escorted him to a holding cell in the program office. See Pl.'s UF ¶ 24. Once he was in the holding cell, Plaintiff requested that Defendant "remove or loosen the handcuffs" because he was "locked in" and "didn't pose a threat," but Defendant "refused." TAC at 1. Plaintiff told Defendant that the handcuffs were "extremely tight" and were "cutting into [his] skin and cutting off [his] circulation," but Defendant ignored him. Id. Plaintiff then again asked

Defendant to remove the handcuffs because he was "locked in a cage" and because the handcuffs were "effecting [his] nerves." Id. at 2. In response, Defendant laughed at Plaintiff, used a racial slur, and stated, "That's what you get for filing 602 administrative appeals and staff complaints for misconduct against us." Id. Defendant then walked away, leaving Plaintiff handcuffed in the holding cell for over two hours. See id. As a result of the handcuffing, Plaintiff states that he experiences chronic pain and discomfort in his right shoulder and wrists. See id.

## III.   EVIDENTIARY OBJECTIONS

Plaintiff objects to several portions of Defendant's Statement of Uncontroverted Facts. See generally Pl.'s UF. A party may object that the material used to "dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). However, "[o]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary. Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (citation omitted); see also Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). Therefore, Plaintiff's relevance objections are overruled. The Court addresses Plaintiff's other objections below where applicable.

## IV.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those necessary to the proof or defense of a claim and are determined by reference to substantive law. See Anderson, 477 U.S. at 248.

The initial burden for a motion for summary judgment is on the moving party to identify the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once that burden is satisfied, the burden shifts to the nonmoving party to demonstrate, through the production of evidence listed in Federal Rule of Civil Procedure 56(c)(1), that there remains a "genuine issue for trial." Id. at 324; see also Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006) ("A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.") (citation omitted). The nonmoving party may not rely upon "unsupported conjecture or conclusory statements." Hernandez v. Spacelabs Med. Inc., 343 F.3d 1107, 1112 (9th Cir. 2003). All reasonable doubts and inferences to be drawn from the facts are to be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted); see also Anderson, 477 U.S. at 255.

## V.  DISCUSSION

Plaintiff asserts he was deprived of his constitutional rights under the First and Eighth Amendments. Defendant argues that Plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim. See MSJ at 16-18. Defendant further argues that no genuine disputes of material fact exist as to whether she retaliated against Plaintiff or subjected him to excessive force in violation of the Eighth Amendment. See id. at 18-21. Finally, Defendant argues she is entitled to qualified immunity. See id. at 21-22.

### A.  <u>Exhaustion of Administrative Remedies</u>

Defendant argues that Plaintiff failed to exhaust his administrative remedies as to his First Amendment retaliation claim. See MSJ at 16-18.

### 1.   Legal Standard

The Prison Litigation Reform Act (PLRA) provides that no suit may be brought under federal law concerning prison conditions until available administrative remedies have been exhausted. See 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. See Booth v. Churner, 532 U.S. 731, 741 (2001).

The PLRA requires "proper exhaustion." Woodford v. Ngo, 548 U.S. 81, 93 (2006). "Proper exhaustion" refers to "using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (citation omitted). Thus, "[s]ection 1997e(a) requires an inmate not only to pursue every available step of the prison grievance process but also to adhere to the 'critical procedural rules' of that process." Reyes v. Smith, 810 F.3d 654, 657 (9th Cir. 2016) (quoting Woodford, 548 U.S. at 90). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." Jones v. Bock, 549 U.S. 199, 218 (2007). The prisoner need only exhaust "available" administrative remedies. Ross v. Blake, 578 U.S. 632, 642 (2016). "Accordingly, an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" Id. (citation omitted).

"Failure to exhaust under the PLRA is an affirmative defense the defendant must plead and prove." Albino v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014) (citation omitted). Under this regime, a defendant "must first prove that there was an available administrative remedy and that the prisoner did not exhaust that available remedy." Williams v. Paramo, 775 F.3d 1182, 1191 (9th Cir. 2015) (citation omitted). The burden then shifts to the prisoner to show that "there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable to him by

'showing that the local remedies were ineffective, unobtainable, unduly
prolonged, inadequate, or obviously futile.'" Id. (citation omitted). The
ultimate burden of proof remains with defendant. See id.

If a district court determines "that the prisoner has exhausted available
administrative remedies, that administrative remedies are not available, or that
a prisoner's failure to exhaust available remedies should be excused, the case
may proceed to the merits." Albino, 747 F.3d at 1171. If, however, the Court
finds that a prisoner has not exhausted available administrative remedies, the
proper remedy is dismissal of the action without prejudice. See McKinney v.
Carey, 311 F.3d 1198, 1200-01 (9th Cir. 2002).

## 2.    CDCR Grievance Procedure

California regulations allow a prisoner to appeal any action or decision
by a prison official that adversely affects the prisoner's health, safety, or
welfare. See Cal. Code Regs. ("CCR") tit. 15, § 3084.1(a) (2019).[5] To exhaust a
grievance, an inmate must pursue his appeal through three levels. See §
3084.1(b). The inmate must first fill out a "Form 602," the "Inmate/Parolee
Appeal Form," describing the problem and action requested. See § 3084.2(a).
An appeal is initially submitted and screened at the first level unless the first
level is bypassed by the appeals coordinator. See § 3084.7(a). If the inmate is
dissatisfied with the first level response or the first level is waived, the inmate
may submit the appeal for a second level review by the hiring authority or
designee. See §§ 3084.7(b), (d)(2). If dissatisfied with the second level response,
the inmate may submit the appeal for a third level review conducted by a
designated representative under the supervision of the third level Appeals

---

[5] Effective June 1, 2020, CCR tit.15, §§ 3084 through 3084.9 were
repealed. The citations in this Report and Recommendation are to the
regulations in place when Plaintiff submitted his grievance concerning
Defendant's conduct at issue in this lawsuit on January 8, 2020.

Chief. See §§ 3084.2(d), 3084.7(d)(3). The third level constitutes the decision of the Secretary of the CDCR and exhausts administrative remedies. See § 3084.7(d)(3).

### 3.    Plaintiff's Efforts to Exhaust

Defendant submitted two declarations in connection with Plaintiff's efforts to exhaust his administrative remedies.

First, Defendant provided the Declaration of J. Stout, who is employed by the CDCR as a Correctional Counselor II Supervisor and assigned as a Grievance Coordinator at CMC. See Dkt. 61-4 ("Stout Declaration") ¶ 1. As a Grievance Coordinator, Stout's duties include receiving, screening, logging, processing, and maintaining records of all non-healthcare grievances submitted by inmates. See id. ¶ 2. Stout conducted a search of the Inmate/Parolee Appeals Tracking System and Strategic Offender Management System for Plaintiff's grievances from December 24, 2019, to September 11, 2023. See id. ¶ 8. A copy of Plaintiff's grievance history is attached to Stout's Declaration as Exhibits A and B.

Second, Defendant provided the Declaration of Howard E. Moseley, who is employed by the CDCR as the Associate Director of the Office of Appeals ("OOA"). See Dkt. 61-7 ("Moseley Decl.") ¶ 1. The OOA receives, reviews, and maintains all non-healthcare appeals. See id. ¶ 2. On September 4, 2024, the OOA conducted a search for all appeals that were received from Plaintiff. See id. ¶ 7. A copy of Plaintiff's grievance appeal history is attached to Moseley's Declaration as Exhibits 1 and 2.

During the relevant time period, Plaintiff submitted four grievances naming Defendant: (1) CMC-20-00149; (2) CMC-20-00435; (3) CMC-20-

01023; and (4) CMC-20-00746. <u>See</u> Stout Decl. ¶¶ 10-14.[6] In CMC-20-00149, Plaintiff complained, in part, that:

> In retaliation for exercising his First Amendment right, [Defendant] told Plaintiff to cuff-up and Plaintiff was escorted to the holding cage outside the program office in order to search his cell and [Defendant] left the tight handcuffs on Plaintiff['s] wrist[s] cutting circulation for 2 hours while she and Officer Urias continu[ed] to search Plaintiff['s] cell.

<u>Id.</u>, Ex. C at 19. On January 21, 2020, the Office of Grievances ("OOG") bypassed the first level of review and submitted CMC-20-00149 for an appeal inquiry. <u>See id.</u> ¶ 11. On March 12, 2020, Plaintiff submitted an appeal of CMC-20-00149 in which he wrote that restraining him with "excessively tight handcuffs cutting off blood circulation [and] numbing [his] wrist and hand areas [and] leaving [him] in pain and discomfort for a period of two hours in a cage is unconstitutional." Moseley Decl. ¶ 9, Ex. 3 at 21. On December 4, 2020, after investigating his claims, the OOA denied Plaintiff's appeal. <u>See id.</u>, Ex. 3 at 16-17.

In CMC-20-00435, Plaintiff complained that Defendant searched his cell on January 28, 2020, in retaliation for the filing of a grievance related to the incident on December 24, 2019. <u>See</u> Stout Decl. ¶ 12. On February 28, 2020, the OOG canceled CMC-20-00435 because Plaintiff refused to be interviewed about this grievance by the reviewing lieutenant. <u>See id.</u>

Next, in CMC-20-01023, Plaintiff contested the cancellation of CMC-20-00435 and complained that the reviewing lieutenant conspired to cover up

---

[6] The TAC also references CMC-20-00944 and CMC-20-01110 as relevant, but neither of those grievances reference Defendant or contain allegations related to this lawsuit. <u>See</u> Stout Decl. ¶¶ 16, 17.

Defendant's acts. See id. ¶ 13. On April 20, 2020, the OOG denied CMC-20-01023 at the second level of review, finding Plaintiff's contention that he never refused to be interviewed was "without merit." See id., Ex. E at 30.

Finally, in CMC-20-00746, Plaintiff complained that Defendant filed a false RVR against him for possession of a cellular component based on "the retaliatory planting of contraband" during the December 24, 2019, cell search. Id. ¶ 14. Plaintiff also complained that the RVR hearing officer violated his due process rights. See id. On April 2, 2020, the OOG denied CMC-20-00746 at the second level of review, noting that Plaintiff's allegations against Defendant were already addressed in response to CMC-20-00149. See id., Ex. F at 38.

### 4. Plaintiff Exhausted His Administrative Remedies

Defendant argues that while Plaintiff alleged in CMC-20-00149 that Defendant handcuffed him too tightly on December 24, 2019, "Plaintiff did not complain that Defendant handcuffed him too tightly because Plaintiff filed grievances." MSJ at 18 (emphasis in original). Therefore, Defendant argues, Plaintiff's First Amendment retaliation claim against her is administratively unexhausted. See id.

Defendant has not carried her burden of showing that Plaintiff failed to exhaust administrative remedies with respect to his First Amendment retaliation claim. "Under the PLRA, a grievance 'suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" Reyes, 810 F.3d at 659 (quoting Sapp v. Kimbrell, 623 F.3d 813, 824 (9th Cir. 2010)). "A grievance . . . need not contain every fact necessary to prove each element of an eventual legal claim." Griffin v. Arpaio, 557 F.3d 1117, 1120 (9th Cir. 2009). "The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." Id.

Contrary to Defendant's claim that in his grievance Plaintiff "complained only about a search being retaliatory," Reply at 2, CMC-20-

00149 explicitly stated: "In retaliation for exercising his First Amendment right, [Defendant] told Plaintiff to cuff-up." Stout Decl., Ex. C at 19. Plaintiff further elaborated that "[Defendant] left the tight handcuffs on Plaintiff['s] wrist[s] cutting circulation for 2 hours while she and Officer Urias continu[ed] to search Plaintiff['s] cell." Id. Thus, Plaintiff's grievance plainly put prison officials on notice of the nature of the wrongs alleged in this lawsuit, namely, retaliatory and overly tight handcuffing by Defendant. Moreover, Defendant's argument that Plaintiff did not alert prison officials to his retaliatory handcuffing claim because CMC staff failed "to identify Plaintiff's allegation as a claim that Defendant's alleged tight handcuffing was retaliatory," Reply at 3, is unavailing. If the Court were to find Plaintiff's retaliatory handcuffing claim unexhausted simply because CMC failed to respond to that specific allegation in his grievance, it would effectively allow prison officials to prevent inmates from pursuing legal remedies by ignoring inmate complaints. See Rupe v. Beard, No. 08-2454, 2013 WL 2458398, at *16 (E.D. Cal. June 6, 2013) (finding that if courts were to find inmate appeals unexhausted where prison officials failed to abide by inmate-grievance regulations, "prison officials could indefinitely delay inmates from pursuing legal remedies simply by ignoring all inmate appeals").

Here, Plaintiff's grievance "provide[d] enough information . . . to allow prison officials to take appropriate responsive measures," and therefore satisfied the purpose of exhaustion. See Griffin, 557 at 1121 (quoting Johnson v. Testman, 380 F.3d 691, 697 (2nd Cir. 2004)). Accordingly, Defendant has not satisfied her burden of proof to demonstrate that Plaintiff failed to exhaust the available administrative remedies as to his First Amendment retaliation claim.

**B.**    <u>**First Amendment Retaliation Claim**</u>

**1.**    **Legal Standard**

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities and as well as a right of meaningful access to the courts." <u>Jones v. Williams</u>, 791 F.3d 1023, 1035 (9th Cir. 2015) (citation omitted). A First Amendment retaliation claim "entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote and citation omitted).

**2.**    **Analysis**

Plaintiff contends that Defendant participated in the cell search and handcuffed him too tightly for retaliatory purposes. <u>See</u> TAC 1-2. Defendant argues she is entitled to summary judgment on Plaintiff's retaliation claim because it is undisputed that the handcuffing was not retaliatory. <u>See</u> MSJ at 18-19.

As a preliminary matter, the Court rejects Defendant's argument that Plaintiff's deposition testimony resolves this issue. Defendant contends that "Plaintiff confirmed in his deposition that Defendant did not retaliate against Plaintiff by handcuffing him on December 24, 2019." <u>Id.</u> Plaintiff's deposition testimony, as cited to by Defendant, is as follows:

> Q. Could you explain why you think she retaliated against you?
>
> A. Because of the 602.
>
> Q. Are you talking about this 602?

A. That's correct.

Q. What action are you claiming was the retaliatory act?

A. The continuous cell searching and – her friends coming to search. They don't do it themselves. They use their friends to come search.

Q. What do you mean by "friends"?

A. Her co-workers, other officers.

Q. So you're saying she had other officers search your cell in retaliation?

A. That's correct.

Q. And in retaliation for what?

A. Writing the first 602, complaining about the excessive force.

Q. So your cell was searched after December 24, 2019, correct?

A. Yes, ma'am.

Q. So the retaliation happened after December 24, 2019, correct?

A. That's correct.

. . .

Q. And then your retaliation claim against Cortez is that she had other officers search your cell because you filed the 602 regarding the handcuffing; is that correct?

A. Yes, ma'am.

Q. And is there any other basis for your retaliation claim?

A. No, ma'am.

See Dkt. 61-3 ("Widman Decl."), Ex. D ("Pl.'s Depo. Tr.") at 38:7-25–39:1-8,
46:15-22.

Presumably, Defendant wants the Court to interpret this deposition
excerpt as an admission by Plaintiff that Defendant's actions on December 24,
2019, could not have been motivated by retaliatory animus because she,
according to Plaintiff, did not order her colleagues to search his cell until after
that date. However, there are problems with this reading because Plaintiff's
deposition testimony does not actually address the conduct by Defendant at
issue in the TAC. In his verified TAC and sworn declaration, Plaintiff states:
(1) that Defendant "acted upon C/O Urias['s] directions when they
conduct[ed] a targeted cell search, based on retaliation," and (2) that before
leaving him tightly handcuffed in the holding cell for two hours, Defendant
told him, "That's what you get for filing 602 administrative appeals and staff
complaints and misconduct against us." TAC at 1-2; Pl.'s Decl. ¶ 10. Here,
Defendant fails to address the possibility that, taking all inferences in Plaintiff's
favor, both Defendant's participation in the cell search and decision to leave
Plaintiff tightly handcuffed in the holding cage on December 24, 2019, and
Defendant's ordering of other officers to search Plaintiff's cell after that date
were retaliatory. Importantly, this possibility is consistent with Plaintiff's filing
of two separate grievances—one which alleged that, on December 24, 2019,
Defendant searched his cell and tightly handcuffed him in retaliation for
exercising his First Amendment rights, and another which alleged that, on
January 28, 2020, Defendant continued to harass and retaliate against him for
filing a staff misconduct grievance against her. See Stout Decl., Ex. C at 19 &
D at 25.

To be clear, the Court construes Plaintiff's First Amendment claims in
this lawsuit to encompass only the allegations in his TAC that, on December
24, 2019, in retaliation for his past grievance activity, Defendant searched his

cell, handcuffed him tightly, and then left him handcuffed in the holding cage
for two hours. Plaintiff's argument that Defendant's alleged retaliatory conduct
after December 24, 2019, should be part of this action because he listed
grievances in which he complained of Defendant's subsequent cell searches in
the TAC—without attaching the grievances or providing any information as to
their contents—is unavailing. See Opp'n at 3. However, the Court does not
interpret, as Defendant appears to suggest, Plaintiff's apparent confusion
during his deposition regarding which retaliatory acts he alleged in his TAC as
an intent to abandon the allegations in his complaint that Defendant retaliated
against him on December 24, 2019.

Viewing the evidence in the light most favorable to Plaintiff, a
reasonable juror could find that Defendant retaliated against him on December
24, 2019, for filing grievances against CMC staff, in violation of Plaintiff's First
Amendment rights. In her reply, Defendant argues that Plaintiff failed to
provide any evidence to establish that her conduct on December 24, 2019, was
retaliatory. See Reply at 4. But as stated above, Plaintiff presented evidence in
his verified TAC and sworn declaration that after Defendant put him in a
holding cage and after he asked her to remove the handcuffs, she stated,
"That's what you get for filing 602 administrative appeals and staff complaints
and misconduct against us." TAC at 2; Pl.'s Decl. ¶ 10.

In Defendant's version of events, based on "the contraband discovery"
and Plaintiff's "disruptive behavior," she determined it was "not safe" for him
to be present during the cell search and ordered him to submit to handcuffs.
Reyes-Cortez Decl. ¶ 8. While Defendant does not "specifically recall whether
[she] escorted inmate White to the program holding cell as alleged," she does
not believe she did "because it is not standard procedure for a housing unit
officer to leave the housing unit in order to escort an inmate to the program

office." Id. ¶ 10.[7] But Defendant does not address whether she at any point told Plaintiff, "[t]hat's what you get for filing 602 administrative appeals and staff complaints and misconduct against us," or whether she had any knowledge about Plaintiff's filing of previous grievances against CMC staff. Even if Defendant had directly contradicted Plaintiff's claims, if a jury found Plaintiff's testimony about Defendant's statement credible, it could reasonably conclude that Plaintiff's filing of grievances against CMC staff was a substantial motivating factor in Defendant's decision to leave Plaintiff handcuffed in the holding cage, despite his complaints that the handcuffs were too tight and cutting off his circulation. Accordingly, because a genuine issue of material fact remains regarding whether Defendant acted based on retaliatory animus, she is not entitled to summary judgment on Plaintiff's First Amendment retaliation claim.[8]

## C.    Eighth Amendment Excessive Force

Plaintiff alleges that, in violation of the Eighth Amendment, Defendant tightly handcuffed him and placed him in a holding cell for two hours, and that, as a result, he suffers chronic pain in his right shoulder and wrists. See TAC at 1-2.

---

[7] Plaintiff's objections under Federal Rule of Evidence 602 to Defendant's statement that she does not recall escorting Plaintiff to or securing him in a temporary holding cell are overruled. See Pl.'s UF ¶¶ 24, 25.

[8] To the extent Defendant argues that she is entitled to qualified immunity on Plaintiff's First Amendment claim, see MSJ at 21-22, the Court disagrees. See Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009) ("It is well-established that, among the rights they retain, prisoners have a First Amendment right to file prison grievances. Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of clearly established law." (citations omitted)).

1.  **Legal Standard**

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners from both inhumane methods of punishment and inhumane conditions of confinement. <u>See</u> <u>Morgan v. Morgensen</u>, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832 (1994)). Use of excessive physical force against a prisoner may constitute cruel and unusual punishment. <u>See</u> <u>Hudson v. McMillian</u>, 503 U.S. 1, 4-6 (1992). "[W]henever prison officials stand accused of using excessive force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Id.</u> at 6-7. Five factors bear on the excessive force analysis: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." <u>Bearchild v. Cobban</u>, 947 F.3d 1130, 1141 (9th Cir. 2020). While "[t]he absence of injury" is "relevant . . . to the Eighth Amendment inquiry, it does not end it . . . When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." <u>Hudson</u>, 503 U.S. at 9.

The Ninth Circuit has recognized that "[o]verly tight handcuffing can constitute excessive force." <u>Wall v. Cnty. of Orange</u>, 364 F.3d 1107, 1112 (9th Cir. 2004). "In general, in cases where tight handcuffing was found to constitute excessive force, the plaintiff was in visible pain, repeatedly asked the defendants to remove or loosen the handcuffs, had pre-existing injuries known to the defendant, or alleged other forms of abusive conduct by defendant." <u>Smith v. Yarborough</u>, No. 04-4502, 2008 WL 4877464, at *12 (C.D. Cal. Nov. 7, 2008).

Recently, courts in this circuit have concluded—after reviewing the
relevant Ninth Circuit case law for both Fourth and Eighth Amendment
excessive force claims—that there are two theories by which a plaintiff can
proceed when he claims he was handcuffed in an overly tight manner. See
Brooks v. Ruiz, No. 21-02010, 2024 WL 2702916, at *14 (C.D. Cal. Apr. 22,
2024), report and recommendation adopted by 2024 WL 2702650 (C.D. Cal.
May 22, 2024) (discussing two theories upon which a plaintiff can rely to
present a triable issue in Eighth Amendment excessive force claim for unduly
tight handcuffing; collecting cases); Ramorino v. County of Los Angeles, No.
23-00090, 2024 WL 3468328, at *5 (C.D. Cal. May 31, 2024) (finding, in
context of Fourth Amendment claim, that "[t]he Circuit's published cases on
this subject, most of which are around two decades old, hazily outline two
theories by which a Plaintiff can make out a claim for excessive force based on
overly tight handcuffing.").[9] Under the first theory, a plaintiff can show his
Eighth Amendment rights have been violated if the tight handcuffing results in
a "demonstrable injury." Smith v. Sergent, No. 15-0979, 2017 WL 4284659, at
*6 (E.D. Cal. Sept. 27, 2017) (collecting cases). Under the second theory, a
plaintiff can prove an excessive force claim for tight handcuffing by presenting
evidence "that he complained about the handcuffs being too tight and was

_____

[9] Courts in this circuit, when analyzing Eighth Amendment claims for
excessive force due to overly tight handcuffing, routinely consider case law
evaluating similar Fourth Amendment claims. See Smith, 2008 WL 4877464,
at *12-13; Brooks, 2024 WL 2702916, at *14; Candler v. Mallot, No. 14-0363,
2015 WL 2235674, at *8 (E.D. Cal. May 12, 2015); but see Rhinehart v.
Montgomery, No. 22-0678, 2025 WL 897442, at *8 (S.D. Cal. Mar. 24, 2025)
(noting factors considered between Fourth and Eighth Amendment tight
handcuffing cases "overlap" but declining to find, for qualified immunity
purposes, a right clearly established under the Fourth Amendment is
necessarily clearly established under the Eighth Amendment).

ignored." Id. Having reviewed the cases in this circuit on tight handcuffing
claims, the Court agrees with this reconciliation of Ninth Circuit case law to
date, which for the most part, appears to fall into these two theories of
liability.[10]

### 2.    Analysis

Based on Plaintiff's allegations in the TAC, it is clear that he is pursuing
relief under both theories of liability outlined above. Accordingly, Defendant
argues she is entitled to summary judgment on Plaintiff's excessive force
claims because: (1) Plaintiff did not suffer any demonstrable injury as a result
of any action by Defendant; and (2) Defendant did not ignore repeated
requests by Plaintiff to remove or loosen the handcuffs. See MSJ at 20-21.

### a.    Theory One: Demonstrable Injury

First, Defendant argues that Plaintiff's claim fails to the extent he alleges
long term injuries caused by the December 24, 2019, handcuffing. See MSJ at
20; Reply at 5. Defendant relies on two things to support this argument: (1)
"Plaintiff did not claim or seek medical treatment for significant demonstrable
physical injury arising from the December 24, 2019 handcuffing," and (2)
Plaintiff's medical record and the opinion of Dr. A. Adams, Chief Medical
Executive at CHCF, support that "Plaintiff's alleged injuries—tingling,
numbness, and pain in his right shoulder extending to his wrist and fingers—
are the result of nerve impingement and arthritis in his neck and shoulder."
MSJ at 20.

As an initial matter, Plaintiff objects to Dr. Adams's declaration on the
grounds that she: "(1) failed to read anything about long-term handcuff
injuries, (2) failed to review any of Plaintiff's pre-injury medical records, (3)

---

[10] Defendant agrees that an Eighth Amendment excessive force claim for
overly tight handcuffing may proceed on either of the two theories described
above. See MSJ at 19.

failed to conduct any differential diagnosis to consider and rule out alternative
explanations for Plaintiff's long-term symptoms, (4) does not claim to have
ever treated handcuff or related injuries, and (5) has not treated any inmates in
12 years." Opp'n at 9.

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an
expert by knowledge, skill, experience, training, or education may testify in the
form of an opinion or otherwise if the proponent demonstrates to the court that
it is more likely than not that: (a) the expert's scientific, technical, or other
specialized knowledge will help the trier of fact to understand the evidence or
to determine a fact in issue; (b) the testimony is based on sufficient facts or
data; (c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and
methods to the facts of the case." Fed. R. Evid. 702. The trial court acts as a
gatekeeper for admissibility of expert testimony. See Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993). "A trial court should admit
medical expert testimony if physicians would accept it as useful and reliable,
but it need not be conclusive because medical knowledge is often uncertain."
Primiano v. Cook, 598 F.3d 558, 566 (9th Cir. 2010).

The Court finds that Dr. Adams's declaration should be considered on
summary judgment. Dr. Adams, who has been responsible for reviewing
medical records and procedures pertinent to medical care issues in the
correctional setting for over fifteen years, properly relied on her medical
expertise in reaching her opinion as to the cause of Plaintiff's symptoms and
injuries. See Adams Decl. ¶ 2. Plaintiff's primary objections to Dr. Adams's
declaration appear to be based on her purported failure to consider certain
medical studies related to handcuffing injuries and Plaintiff's medical records
predating the December 24, 2019, handcuffing incident. But Plaintiff's
contention that Dr. Adams has not read "anything about long-term handcuff

injuries," Opp'n at 9, is speculative. Moreover, while Plaintiff may take issue with the methodology Dr. Adams used in reaching her opinion, Plaintiff has not shown that he or his son have the medical expertise necessary to opine on why the steps Dr. Adams took in reviewing Plaintiff's medical records were inadequate. Indeed, Dr. Adams's declaration shows she evaluated many pertinent medical records related to Plaintiff's complaints of numbness and tingling, including records detailing x-ray, MRI, and electromyography testing results of Plaintiff's cervical spine. See id. ¶¶ 7-11. To the extent Dr. Adams did not consider Plaintiff's medical records before December 24, 2019, the failure to consider such documents goes to the weight of Dr. Adam's opinion rather than admissibility. See Alfaro v. United States, No. 21-09668, 2025 WL 811100, at *4 (C.D. Cal. Jan. 15, 2025), report and recommendation adopted by 2025 WL 808238 (C.D. Cal. Mar. 13, 2025) (finding medical experts' purported failure to consider certain medical records goes to "the weight of the experts' opinions rather than admissibility"). On a motion for summary judgment, the Court does not weigh evidence or make assessments of credibility. See Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Thus, the Court declines to exclude or disregard Dr. Adams's declaration in considering Defendant's motion.

Turning to the medical records showing the treatment Plaintiff sought for his alleged handcuffing injuries, the Court notes that based on a review of Plaintiff's grievance history, it appears that he may have sought medical treatment on January 8, 2020 related to the December 24, 2019 handcuffing. See Moseley Decl., Ex. 3 at 23 (listing a "Medical Report of Injury of Unusual Occurrence on WHITE, dated January 8, 2020" as part of record considered in resolving Plaintiff's grievance concerning the December 24, 2019 incident); see

also Pl.'s Decl. ¶ 6 ("The day after I filed my grievance against Defendant for retaliation, I was called by medical staff to have my handcuff injuries examined and documented."). However, because neither party provided any documentation of this January 8 medical encounter, the Court has no information regarding what injuries, if any, were documented on that day.[11]

More than three months later, Plaintiff complained about pain in his right arm and shoulder immediately following an incident on April 7, 2020, in which he was allegedly "approached and placed in handcuffs by Officer Monteiro." Adams Decl., Ex. A-1 at 8. Plaintiff reported that "in April 2020, he was placed in handcuffs for 2 hours and after that, he felt the numbness in his right arm[.]" Id., Ex. A-2 at 10. On October 2, 2020, in response to Plaintiff's ongoing complaints of numbness, his treating physician, Dr. Pido, observed, "I doubt being handcuffed for 2 hours 6 months ago would have caused his tingling sensation in his right upper extremity. He probably has an underlying cause for the symptoms." Id., Ex. A-2 at 11. Accordingly, Dr. Pido ordered, and Plaintiff underwent, medical treatment and various diagnostic tests for his alleged injuries. These tests revealed that Plaintiff has degenerative conditions in his spine, neck, and shoulders, including nerve impingement and arthritis, and a bullet that projects over his lower cervical spine. See id., Exs. A-5 at 30, A-6 at 32, A-7 at 35. According to Dr. Adams, the degenerative conditions in Plaintiff's spine and neck "classically result in the type of sensations he is now feeling in his right upper extremity." Adams Decl. ¶ 14.

---

[11] Plaintiff also argues that he complained of injuries from the December 24, 2019, handcuffing in videotaped interviews with CMC staff on January 8 and 19, 2020. See Pl.'s UF ¶ 30. Plaintiff states that at least one of these videos "still exists" and that he viewed it on March 12, 2025. Id. However, the Court cannot determine what injuries Plaintiff alleged during this interview because Plaintiff did not describe what was discussed during this interview and did not lodge a copy of the video with the Court.

Moreover, according to Dr. Adams and consistent with Dr. Pido's observations, "excessive handcuffing, including the April 2020 handcuffing, would not cause the neural sensations [Plaintiff] has complained of in this lawsuit." Id.

To contradict Dr. Adams's opinion, Plaintiff submitted a declaration from his son, Pedro White, Jr., who "conducted a systematic scholarly literature review of medical journal articles and handcuff injuries" and attached many of those articles, which the Court has reviewed. Dkt. 34 at 34-35 ("White Decl.") ¶ 4. Notwithstanding these medical articles, however, Plaintiff has not pointed to any medical records showing that any of his alleged long-term injuries can be attributed to Defendant's actions. Plaintiff's allegations show he believes his injuries arose from the handcuffing on December 24, 2019. However, Plaintiff's medical records showing complaints of arm and shoulder pain related to an entirely different handcuffing incident, coupled with Dr. Pido's diagnoses and Dr. Adams' declaration, makes this belief implausible. See Rhinehart, 2025 WL 897442, at *3 (finding plaintiff's diagnosis of arthritis, along with expert physician's declaration, made "implausible" plaintiff's belief that his shoulder injury was caused by restraints during transport).

Plaintiff further argues that regardless of the source of his long-term injuries, the evidence in the record shows that Defendant's handcuffing of him on December 24, 2019, caused him immediate, short-term injuries. See Opp'n at 8. Specifically, Plaintiff points to his allegations in the TAC that the handcuffs were "cutting into [his] skin and cutting off [his] circulation" and his deposition testimony that swelling, bruising, and tingling from the handcuffs caused ten out of ten pain. Id. (citing Dkt. 71 at 21-28 ("Pl.'s Depo. Tr.")) at 30:4-23, 32:7-11. However, courts that have considered excessive force claims related to overly tight handcuffing have found that "complaints of bruising,

swelling, scrapes, and pain, without evidence of more serious injury, indicate
de minimus injury at best." <u>Ward v. Oromde</u>, No. 09-2542, 2011 WL 4056035,
at \*12 (E.D. Cal. Sept. 12, 2011); <u>Ramorino</u>, 2024 WL 3468328, at \*5 (holding
that no reasonable jury could conclude that Plaintiff's allegations that she
suffered bruising from the handcuffs "digging into [her] wrists" constituted
more than de minimus injury).

The Court thus finds that the undisputed evidence indicates that Plaintiff
suffered, at worst, de minimus injuries as a result of the handcuffing on
December 24, 2019. Accordingly, Plaintiff's claim cannot survive summary
judgment via the first theory of an overly tight handcuffing excessive force
claim. As noted above, however, this conclusion does not end the inquiry into
whether Defendant's handcuffing of Plaintiff violated his Eighth Amendment
rights; the Court must also evaluate whether Defendant ignored Plaintiff's
requests to loosen or remove the handcuffs. <u>See</u> <u>Smith</u>, 2017 WL 4284659, at
\*6 ("It that appears most courts in this circuit have held that a plaintiff
attempting to prove excessive force must show either a demonstrable injury <u>or</u>
that he complained about the handcuffs being too tight and was ignored."
(emphasis added)); <u>see also</u> <u>Wright v. Goord</u>, 554 F.3d 255, 269 (9th Cir.
2009) ("[W]here a prisoner's allegations and evidentiary proffers could
reasonably, if credited, allow a rational factfinder to find that corrections
officers used force maliciously and sadistically, our Court has reversed
summary dismissals of Eighth Amendment claims of excessive force even
where the plaintiff's evidence of injury was slight and the proof of excessive
force was weak.").

     b.   <u>Theory Two: Repeated Requests to Have Handcuffs
Loosened</u>

Defendant, pointing to Plaintiff's deposition testimony, argues that
Plaintiff testified that he asked Defendant to remove the handcuffs only once:

> A. . . . Officer Cortez placed me in handcuffs, walked me across the yard and put me in the cage, and left me in the cage with the handcuffs on too tight, and I told her before she left, "The handcuffs are too tight. Can you take them off?" She told me, "No, stay in the cage."
>
> Q. And is that all of the events that you are bringing in this suit?
>
> A. The excessive force?
>
> Q. Yes.
>
> A. She had some other choice words for me, but --
>
> Q. You mentioned that every day you had in line. Can you describe what "in line" is?

Pl.'s Depo. Tr. at 17:4-15. Plaintiff contests Defendant's portrayal that he complained about the handcuffs only once, arguing that his allegations in the TAC and his other deposition testimony clearly indicate that he repeatedly told Defendant that the handcuffs were too tight. See Opp'n at 6-7. The Court agrees with Plaintiff.

First, based on the excerpt of Plaintiff's deposition testimony above, it appears Defendant's counsel may have interrupted Plaintiff before he could finish explaining his allegations of excessive force. Second, Plaintiff submitted another excerpt from his deposition that shows that he testified that he complained twice that the handcuffs were too tight. See Pl.'s Depo. Tr. at 43:9-11 ("Q: Do you recall how many times you informed Cortez that the handcuffs were too tight? A. Twice."). Third, Plaintiff's verified TAC alleges that he repeatedly requested that Defendant remove or loosen the handcuffs, telling her that "the cuff's were extremely tight," that they were "cutting into [his] skin and cutting off [his] circulation," and that they were "affecting [his] nerves." TAC at 1-2.

Defendant responds that Plaintiff's contention that he repeatedly informed her that the handcuffs were too tight is refuted by her declaration, in which she attested that she "did not know that the handcuffs were too tight and that she does not recall being involved in placing Plaintiff in the program office holding cell where Plaintiff allegedly asked her to loosen the cuffs." Reply at 5. But this argument merely establishes there are disputes of material fact, namely, whether Defendant escorted Plaintiff to the holding cell and whether Plaintiff informed her that the handcuffs were too tight. Resolving this conflict on summary judgment would require the Court to impermissibly weigh the credibility of Plaintiff's testimony and allegations, an undertaking that is plainly inappropriate for summary judgment. See Lalonde v. Cnty. of Riverside, 204 F.3d 947, 960 (9th Cir. 2000) ("The issue of tight handcuffing is usually fact-specific and is likely to turn on the credibility of the witnesses."). If Plaintiff's version of events is credited, a jury could find that Defendant's failure to loosen or remove the handcuffs—despite the fact that Plaintiff was securely held in a holding cell and repeatedly complained that the handcuffs were too tight and causing pain—was done "maliciously and sadistically to cause harm."

Accordingly, summary judgment should be denied as to Plaintiff's second theory of excessive force based on overly tight handcuffing because there is a dispute of material fact as to whether Defendant ignored Plaintiff's requests to have his handcuffs loosened.

**D.    Qualified Immunity**

"In § 1983 actions, 'qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'" Sampson v. Cty. of Los Angeles, 974 F.3d 1012, 1018 (9th Cir. 2020) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).

Qualified immunity balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231. To determine whether a governmental official is entitled to qualified immunity in the context of summary judgment, courts must consider "(1) whether the evidence viewed in the light most favorable to the plaintiff is sufficient to show a violation of a constitutional right and (2) whether that right was clearly established at the time of the violation." Sandoval v. Cty. of San Diego, 985 F.3d 657, 671 (9th Cir. 2021) (citation omitted).

As to the first prong, there is a genuine dispute of material fact as to whether Defendant violated Plaintiff's Eighth Amendment rights. Accordingly, the Court focuses on the second prong. A constitutional right is "clearly established" if "every reasonable official would have understood that what he is doing violates that right at the time of his conduct." Sampson, 974 F.3d at 1018-19. The requirement is designed to give "government officials breathing room to make reasonable but mistaken judgments about open legal questions." Sandoval, F.3d at 674. "This inquiry is an objective one that compares the factual circumstances faced by the defendant to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would have made clear to the defendant that his conduct violated the law." Id.

Defendant argues that it was not clearly established that her handcuffing of Plaintiff violated his Eighth Amendment rights because she "saw nothing in Plaintiff's conduct or demeanor that would suggest that the handcuffs were unusually tight." Id. at 22. However, this argument appears to be entirely based on Defendant's version of events that Plaintiff did not inform her that the handcuffs were too tight, which as discussed above, is disputed by Plaintiff.

"It is well-established that overly tight handcuffing can constitute excessive force." Wall, 364 F.3d at 1112. Indeed, several cases have found that officers are not entitled to qualified immunity on excessive force claims for overly tight handcuffs in similar circumstances. Thompson v. Lake, 607 F. App'x 624, 625 (9th Cir. 2015) (finding genuine issues of material fact as to whether handcuffs used to restrain arrestee were actually too tight, and whether officers checked handcuffs to ensure that they were not too tight precluded summary judgment on qualified immunity grounds); Alexander v. Cnty. of L.A., 64 F.3d 1315, 1323 (9th Cir. 1995) (denying qualified immunity to officers who refused to loosen handcuffs on a dialysis patient); Casteneda v. Quiring, No. 21-2196, 2025 WL 528960, at *18 (E.D. Cal. Feb. 18, 2025), report and recommendation adopted by 2025 WL 832502 (E.D. Cal. Mar. 17, 2025) (finding defendants not entitled to qualified immunity as to plaintiff's Eighth Amendment excessive force claim because "a reasonable correctional officer would know that the failure to loosen overly tight handcuffs on a prisoner securely held in a holding cell would be unconstitutional"); but see Sinclair v. Atkins, 696 F. App'x 773, 777 (9th Cir. 2017) (upholding district court's grant of qualified immunity where appellants failed to cite authority holding that detainee's complaints of tight handcuffs alone, without any physical manifestation of injury, where initial handcuffing was justified to carry out search warrant, constituted excessive force). Thus, taking Plaintiff's allegations as true, a reasonable correctional officer would know that the failure to loosen overly tight handcuffs on an inmate, even after the inmate repeatedly informs the officer that the handcuffs are causing pain because they are too tight, would be unconstitutional.

As a result, the Court is unpersuaded that Defendant is entitled to qualified immunity from Plaintiff's excessive force claim.

## VI.   RECOMMENDATION

IT IS THEREFORE RECOMMENDED that the District Judge issue
an Order: (1) accepting this Report and Recommendation; and (2) denying
Defendant's motion for summary judgment.

Date: July 11, 2025

DOUGLAS F. McCORMICK
United States Magistrate Judge